IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
1:11-cr-402-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DEFENDANTS' TRIAL BRIEF |
| v. | ) | |
| | ) | |
| JORGE PETER CORNELL, | | |
| et al. | ) | |

## MATTER BEFORE THE COURT

This memorandum of law is submitted as a trial brief on behalf of Defendant Jorge Peter Cornell in connection with several issues expected to arise at the trial of this case. Counsel for Defendant Cornell is authorized to state that Defendants Russell Kilfoil, Randolph Kilfoil, Samuel Velasquez, Carlos Coleman, Ernesto Wilson, and Irvin Vasquez join in this brief.

## STATEMENT OF FACTS

Seven defendants are currently scheduled to go to trial starting October 17, 2012 under an indictment charging that they engaged in racketeering and other activities prohibited by several federal statutes. Specifically, Count 1 of the superseding indictment charges the seven defendants with engaging in a conspiracy beginning on an unknown date continuing until November 29, 2011 to conduct the affairs of the enterprise (the Latin Kings) through a pattern of racketeering activity. The Latin Kings are alleged to be an enterprise that engages in or activities affecting interstate and foreign commerce. Count One further alleges the purpose of the enterprise was to promote, preserve and protect the power, territory and operations and prestige of the Latin Kings. The indictment goes on to allege that the members of the enterprise and conspiracy committed at least 41 overt acts in furtherance of the conspiracy and objectives of the enterprise.

Count 2 of the indictment alleges that on or about April 4, 2008, Defendant Jorge Peter

Cornell and Marcelo Ysrael Perez assaulted a person with a dangerous weapon in Guilford County in violation of 18 U.S.C. § 1959(a)(3) and (2)). Count 3 of the indictment charges Defendant Jorge Peter Cornell and Marcelo Ysrael Perez with knowingly carrying and using by discharging a firearm during and in relation to a crime of violence on April 4, 2008 in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (2).

The conspiracy charged in Count 1 falls under 18 U.S.C. § 1962(d) which makes it unlawful for a person to conspire to violate the provisions of subsections a, b, or c of 18 U.S.C. § 1962. In this case, the Government charges that the conspiracy was to violate § 1962(c) by conducting an enterprise engaged in interstate or foreign commerce through a pattern of racketeering activities. There are five essential elements to commission of a violation of § 1962(c):

(1) an enterprise exists or existed;

(2) defendant was associated with the enterprise;

(3) defendant conducted or participated in the affairs of the enterprise;

(4) such conduct or participation constituted a pattern of racketeering activities; and

(5) the enterprise had an effect on interstate or foreign commerce.

See *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985). *United States v. Hooker*, 841 F. 2d 1225, 1227 (4th Cir. 1988).

To secure a conviction under § 1962(c) of RICO the Government must prove, among other things, that at least two related racketeering acts have been committed. Racketeering activity is defined as either "any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene material, or dealing in a controlled substance or

enlisted chemical .... which is chargeable under state law and punishable by imprisonment for more than one year." or "any act which is 'indictable' under any of an extensive list of federal offenses, 18 U.S.C. § 1961(1)." Six of the ten types of racketeering acts listed in Count 1 (¶15) of the Indictment are predicated on North Carolina state law offenses. Because of the state law predicates, the Government must prove the substantive elements of the state law offenses that form the basis for these alleged racketeering acts. § 1961(1) defines racketeering activity as predicated on state law as acts which are "chargeable under state law and punishable by imprisonment for more than one year." That section goes on to define a "pattern of racketeering activity as requiring 'requiring at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and last of which occurred within ten years after commission of the prior act of racketeering activity."

ARGUMENT

I. TO PROVE THE CONSPIRACY CHARGE ALLEGED IN COUNT 1 OF THE INDICTMENT, THE GOVERNMENT MUST PRODUCE EVIDENCE SUFFICIENT TO ESTABLISH THAT THE ALLEGED ENTERPRISE SUBSTANTIALLY AFFECTED INTERSTATE OR FOREIGN COMMERCE.

The specific section of RICO charged in this case applies only to enterprises that are "engaged in, or activities of which affect common interstate or foreign commerce" 18 U.S.C. § 1962(c). This is a jurisdictional element. In the present case, the indictment does not allege that the enterprise was a commercial enterprise engaged in either interstate or foreign commerce. Thus, the Government must prove that the enterprise alleged affected interstate or foreign commerce. The Government contends in its trial brief and jury instructions that only a *de minimis* effect on interstate commerce must be proven. For the reasons set forth in this brief, Defendant

3

submits that there must be proof of substantial effect on interstate commerce to sustain a conviction in this case.

The federal circuits are split concerning the degree of effect on interstate or foreign commerce required where, as here, the indictment has alleged that the defendants are engaged in an enterprise which is non-commercial in nature. The Government's trial brief cites the First Circuit's decision in *United States v. Nascimento*, 491 F. 3d 25, 37 (1st Cir. 2007) in support of its assertion that the enterprise's effect on interstate or foreign commerce need only be minimal to establish the jurisdictional element. In contrast, the Court of Appeals of the Sixth Circuit in *Waucaush v. United States*, 380 F. 3d 251 (6th Cir. 2004) overturned a RICO conviction of a violent street gang member because of the Government's failure to prove that the violent activities of the street gang had a substantial effect on interstate commerce.

The circuit split on this issue is based on the different views the lower courts have given to several recent Supreme Court decisions that have dealt with the extent of the Commerce Power in the context of federal criminal statues. In the first of these cases, *United States v. Lopez*, 514 U.S. 549, 558 (1995), the Court struck down the Gun-Free School Zones Act of 1990, which made it a federal offense to possess a firearm within one thousand feet of a school. The Court held that the law was an unconstitutional extension of Congress's power under the Commerce Clause. According to the Court, "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce," and it held that the statute in question "ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." The Court acknowledged that firearms near schools contribute to crime, which in turn has costly effects on the national economy. But these effects were too attenuated to

4

qualify as "substantial" under Commerce Clause doctrine. In addition, the aggregation principle from *Wickard v. Wilburn,* 317 U.S. 111 (1942) was inapplicable because, according to the Court, aggregation is only permissible with regard to economic activity.

The Supreme Court further reined in Congress's commerce power in *United States v. Morrison*, 529 U.S. 598, 609–13 (2000) in which it struck down as unconstitutional the Violence Against Women Act, a statute which provided a civil cause of action for victims of violence motivated by gender. The act focused on violence that was non-economic in nature and its individual manifestations did not by themselves have a substantial impact on interstate commerce. The Court rejected the government's argument that the Commerce Clause covered the legislation because, under *Wickard,* the aggregate effects of such violence substantially affected interstate commerce. According to the Court, the aggregation principle was inapplicable because gender-motivated violence was not commercial. In sum, the Court "reject[ed] the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."

As in *Lopez*, the Court in *Morrison* was concerned with Congress's attempt to enter into the traditionally state-based realm of violent crime. According to the Court, "[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." Striking down the Violence Against Women Act was essential to respecting the states' police power, for "if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence."

In *Jones v. United States*, 529 U.S. 848 (2000), the Supreme Court held that, in light of

the limits on the Commerce Clause, the incineration of a private residence did not affect interstate commerce within the meaning of the federal arson statute. *Jones,* 529 U.S. at 850. Presumably, the owners of the torched home held jobs and bought interstate goods as part of their day-to-day lives, but the Court deemed these attenuated effects on commerce insufficient. Later cases found that no substantial effect on interstate commerce resulted when the defendant "robbed private citizens in a private residence of approximately $ 4,200, a mere $ 1,200 of which belonged to a restaurant doing business in interstate commerce." *United States v. Min Nan Wang*, 222 F.3d 234, 240 (6th Cir. 2000). See also *United States v. Corp*, 236 F.3d 325, 332 (6th Cir. 2001).

In all of these cases, the courts rejected the idea that a *de minimis* effect of a violent crime on interstate commerce could be aggregated with other similar conduct to justify the use of the Commerce Clause to make the charged conduct a federal crime.

Although the Supreme Court rejected Congress's attempts to regulate gender-motivated violence and guns near school and arson of private homes, the Court subsequently held in *Gonzales v. Raich*, 545 U.S. 1, 25 (2005) that the Commerce Clause gave Congress the power to criminalize "intrastate, cultivation, possession and use" of medical marijuana. In *Raich,* the Court returned to the aggregation principle of *Wickard* saying that because of the aggregated effect that *de minimis* possession of medical marijuana on the comprehensive national scheme of regulation of controlled substances, the Commerce Power could be used to proscribe the conduct. The RICO street gang case, *Nascimento*, relied upon *Raich*. The Government bases its *de minimis* approach in this case on *Nascimento*.

Defendant Cornell suggests that the better reasoned case law is reflected in *Waucaush*.

6

Under it, the Government must prove that the enterprise it has alleged in this case had a substantial effect on interstate commerce. The conduct involved in this case does not involve a fungible commodity in a regulated industry like *Raich,* but is much more similar to the cases, like *Lopez, Morrison and Jones,* in which the Supreme Court has found that a *de minimis* effect on interstate commerce is insufficient to sustain a conviction under a federal criminal statute.

The conduct the Government seeks to punish in the present case is almost identical to the conduct that the Supreme Court refused to aggregate in *Morrison*. Applying RICO to violent local criminal activity would overstep the commerce power. Contrary to the conclusion reached by the First Circuit, *Morrison* deals with the same kind of activity — criminal violence — that RICO does, and so it and *Lopez* are the better precedent, not *Raich*. Because the suppression of violent crime is the quintessential police power of the states and because *Lopez and Morrison* explicitly state that Congress shall not regulate that which is left for the police power, non-economic street gang activity is not the type of activity that should be regulated by Congress. In order to avoid granting Congress power that the Constitution does not afford it, the Court must rule that RICO does not apply to intrastate street gang activity that does not substantially affect interstate commerce.

II. APPLICABLE LAW REQUIRES THAT THE GOVERNMENT PROVE THAT THE MAPLEWOOD SHOOTING IN COUNT TWO AND THE OVERT ACTS IN COUNT ONE WERE COMMITTED IN FURTHERANCE OF THE RACKETEERING ENTERPRISE ALLEGED IN COUNT 1 OF THE INDICTMENT.

The prosecution must establish a nexus between the predicate or overt act and the RICO enterprise in both the conspiracy charged in Count 1 and the VICAR count in Count 2. See *e.g. United State v. Bruno*, 383 F. 3d 65, 85-86 (2nd Cir. 2004)(RICO and VICAR case); *United States*

v. *Ferguson*, 246 F. 3d 129, 136 (2nd Cir. 2001)(VICAR case); *United States v. Polanco*, 145 F. 3d 536, 539-40 (2nd Cir. 1998)(VICAR case); and *United States v. Thai*, 29 F. 3d 785, 818 (2nd Cir. 1994)(VICAR case).

Perhaps, not surprisingly, the Second Circuit has a much more developed jurisprudence than the Fourth Circuit on what is necessary to establish the necessary relationship between alleged predicate acts and an alleged RICO enterprise. For example *United States v. Bruno*, *supra*, arose from the November 24, 1994 shootings of Genovese Crime Family associates Sabatino Lombardi and Michael D'Urso by John Imbrieco and Anthony Bruno while the victims were playing cards at a Genovese Crime Family social club. Although Lombardi was fatally wounded, D'Urso survived and subsequently became a cooperating witness for the Government. Bruno, Imbrieco, and the "getaway" driver, defendant Angelo Cerasulo, later pled guilty to various crimes and agreed to cooperate with the Government. The remaining participants in the November 1994 shootings -- defendants-appellants Mario Fortunato and Carmine Polito -- were subsequently tried for, and convicted of, violating various federal statutes relating to the *Violent Crimes in Aid of Racketeering Act* ("VCAR"), the *Racketeer Influenced and Corrupt Organizations Act ("RICO")*. On appeal, the Second Circuit reversed the RICO and VICAR convictions because the Government's evidence was insufficient to establish that the shootings were in furtherance of the charged enterprise.

The *Bruno* court reviewed the decisions where it had applied the requirements under RICO for proving the connection of the predicate act to the RICO enterprise. In *Bruno*, there was a VICAR count, as there is in Court 2 of the Indictment in the present case, that charged that a violent act, as here, was committed to maintain or increase position in a racketeering enterprise.

The *Bruno* Court noted:

> For example, we have affirmed racketeering convictions when: (i) the charged racketeering acts were committed or sanctioned by high-ranking members of an enterprise to protect the enterprise's operations and to advance the objectives of the enterprise; and, similarly, (ii) where one or more leaders of an enterprise committed the charged racketeering acts in response to a threat posed to the enterprise and to prevent the leaders' positions within the enterprise from being undermined by that threat. On the other hand, we have reversed or vacated defendants' racketeering convictions in cases where the evidence showed that the murders (or other racketeering acts) were "purely mercenary," *Thai,* 29 F.3d at 818, and in cases where the defendant was neither a member of the enterprise nor involved in its criminal activities.

383 F.3d at 83. Using these standards the *Bruno* Court reversed the murder and attempted murder VICAR conviction for lack of connection of to the enterprise.

On the RICO conspiracy count, the *Bruno* Court further reviewed the requirement that predicate or overt acts further the enterprise. Based on its review of the evidence, the *Bruno* Court reversed the RICO conviction finding that the evidence showed that the murder and attempted murder were committed for personal reasons and found no evidence that it furthered the enterprise charged.

In the present case, the Government charges in the VICAR count, Count two, that the Maplewood shooting, was committed to maintain or increase Defendant's position within the Latin Kings. The Government must prove this to sustain the charge. As to the RICO conspiracy charged in Count One, it is unclear from the Indictment how the Government contends the numerous alleged predicate or overt acts are connected to and promote the alleged enterprise. Defendant submits that there will be a failure of proof by the Government as to the connection between the overt acts and the enterprise charged in the conspiracy. This will have to be assessed further at trial.

III. ALTHOUGH THE FOURTH CIRCUIT HAS APPROVED "EXPERT" TESTIMONY IN CONNECTION WITH PROOF OF THE ASPECTS OF GANGS, MUCH OF THE EXPERT TESTIMONY PROPOSED FROM THE GOVERNMENT IN THIS CASE EXCEEDS THE SCOPE OF APPROPRIATE EXPERT TESTIMONY AND INTRUDES UPON THE PROVINCE OF THE JURY.

In its trial brief, the Government indicated that it would offer gang "expert" testimony from case agent John Lowes. Since filing its trial brief, the Government fleshed this out a bit in the notice of expert testimony it filed on October 8. [Docket #235]. Although the Notice does not give much detail of the opinion or the basis of the opinion, it states:

> Opinion Testimony: Corp. Lowes will attest to the existence and formation of the Latin King gang in North Carolina, gang organization, indicia of gang affiliation and **gang activity as it relates to a criminal enterprise**. He will also testify to the nature of the Latin King gang, and its activities in and surrounding the Greensboro, North Carolina area; the **violent nature of the Latin Kings**; identifiers such as: colors, signs, tattoos, monikers, membership, past and current activities; types of crimes, **manner of the commission of the crimes**, **personal communications with gang members,** and interpretation of phrases and jargon used by the Latin King gang. Corp. Lowes bases his opinion on field observations, current and past communications with gang members, street "intelligence", information obtained in his day-to-day police responsibilities, and documents reviewed form the investigation of this case.

The Government also identified as a gang expert a former NYPD officer David Milani who the Government states will offer the following opinions:

> Opinion: Mr. Milani will opine that the organization charged in the superseding indictment, Almighty Latin King & Queen Nation of North Carolina (Latin Kings) is an organized street gang, patterned after the Almighty Latin King & Queen Nation of New York and Chicago and **engaged in organized criminal activity.**

Defendant Cornell submits that the proposed "expert" testimony exceeds the scope of permissible expert testimony that may aid the jury with unfamiliar terms or concepts into assertions that constitute inadmissible hearsay, assertions of fact not based on personal knowledge, and assertions that may violate the Confrontation Clause.

10

While Defendant Cornell acknowledges that the Court of Appeals for the Fourth Circuit has approved "gang" expert testimony in a number of cases, see e.g. *United States v. Tolliver*, 387 Fed. Appx. 406 (4th Cir. 2010); and *United States v. Ayala*, 601 F3d 256 (4th Cir. 2010), the scope of the "expert" testimony proposed in this case far exceeds what the Fourth Circuit has previously approved as expert testimony. For example in *Tolliver,* the "gang" expert testified as to what tattoos on a defendant were gang indicia:

> Each of the photographs was authenticated by the officer who took the pictures, State Police Special Agent Smith, a member of the drug enforcement unit. The government further offered Special Agent Smith as an expert, and he was qualified as such, in the area of the symbols, colors, customs, and protocols of the BHB. After the picture of each tattoo was authenticated by Special Agent Smith, the government asked him what meaning the tattoo had for the BHB. Special Agent Smith responded, for example, that the LOVE and LOYALTY tattoos on Toliver's arms were two of the five prongs of the BHB creed, and the five pointed crown over the B stood for the five-pointed star that was the symbol of the Bloods. Special Agent Smith's analysis of the meaning of each tattoo was based on his specialized training on the BHB gang.

In *Ayala*, the government called three experts on the history, structure, and practices of MS-13 to the stand. First, Detective Frank Flores of the Los Angeles Police Department provided a general overview of the gang's history, structure, and operations. Second, a police officer from El Salvador, appearing under a pseudonym for his own protection, testified about the gang's structure and its activities in El Salvador. Third, Sergeant George Norris of the Prince George's County Police Department testified that some items seized during the investigation, such as membership rolls and dues sheets, were likely associated with MS-13. The *Ayala* case dealt with the defendant's challenge to expert testimony using a *Crawford* Confrontation Clause challenge and concluded that because the information was not a conduit for testimonial information, it did not run afoul of the Confrontation Clause.

11

The Fourth Circuit has recognized that Confrontation Clause problems can arise in the context of drug or gang expert testimony. For example, in *United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009), the Court examined the situation where this can arise. While approving the admission of expert testimony about the meaning of code words used by alleged drug dealers, the Court indicated:

> An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion" would provide an end run around *Crawford*. *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree.

In the present case, the Government's notice of expert testimony indicates that it will seek testimony from its "experts" that goes well beyond the explanation of the meaning of tattoos, gang indicia and code words. For example, the government's notice indicates that it will seek to introduce opinion testimony about the relationship of violent or criminal acts to the enterprise (**"gang activity as it relates to a criminal enterprise"**), the **"violent nature of the Latin Kings"**, and testimonial statements personal communications with gang members (**"personal communications with gang members"**). All of these are beyond the scope of "gang" expert testimony that has been countenanced by the Fourth Circuit.

Because of these issues, and because the Government's notice is quite vague as to the experts' specific opinions and their basis, Defendant requests an opportunity to conduct voir dire of the Government's experts prior to their testimony in this case.

12

Respectfully submitted this the 16th day of October, 2012.

          LAW OFFICE OF MICHAEL W. PATRICK

By:  */s/ Michael W. Patrick*
   Michael W. Patrick
   N.C. Bar #7956
   312 West Franklin Street
   P.O. Box 16848
   Chapel Hill, N.C. 27516
   (919) 960-5848 (telephone)
   (919) 869-1348 (facsimile)
   Email: mpatrick@ncproductslaw.com
   ***Attorney for Defendant Jorge Cornell***

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of October, 2012 I electronically filed the foregoing with the clerk of the court using the CM/ECF system which will provide a copy of the motion on counsel of record.

          */s/ Michael W. Patrick*
          ***Attorney for Defendant Jorge Cornell***